Mr. Fair, let's try. Thank you, Your Honors. May it please the Court, my name is Tom Fair. I represent the defendants in this case and the appellants. Our briefs lay out many reasons why the District Court erred in applying the EFAA to this matter. I want to discuss two of them in particular today. The EFAA only applies to claims of sexual assault or sexual harassment and only to those arising or accruing after its effective date in March of 2022. Appellee's complaint fails on both counts. First, she has not alleged facts sufficient to state a among the 686 paragraphs of the Second Amendment complaint, the vast majority of what alleged. So your position is that the plausibility standard applies and not something else? That is our position, Your Honor. There are cases that are saying go in both ways, but some say we should look to plausibility, some say we should, as long as there's a non-frivolous allegation that that is sufficient. So why should we adopt the plausibility standard? Two reasons, Your Honor. The cases, and there are something like eight to ten of them now coming from the District Court, the vast majority of them apply the plausibility standard. They do so for a lot of very good reasons as laid out in those opinions, but primarily because plausibility has been a longstanding practice and standard in the Federal Court. It is something that Congress certainly was aware of at the time that it enacted the EFAA, and the notion that you would apply a lower standard, the frivolous standard, would essentially say that Congress had intended to allow anybody to simply use the words sexual harassment and avoid the FAA, which is a longstanding and important Federal law. It wouldn't have to be that, right? Because, you know, in cases where we get Federal question jurisdiction, we do not say that you get into Federal Court only if the Federal claim is plausible. We say something like if it's clear that the Federal claim is completely frivolous or was made to get it to gain the jurisdiction, then it won't count. But there can be something less than plausibility that would still count. That's a jurisdictional question, right? In some situations, yes. But as we've also identified in our brief, there are other situations where Congress uses the word allegation and specifically means, and the courts have found that it means, alleging facts. Here the statute uses the words conduct that is alleged to constitute sexual harassment, and that seems to provide some support for the plaintiff's position. It provides, I suppose, some support on its face. But again, that's contrary to other decisions applying the standard where Congress has used the word allege, where it requires — it's been found to require allegation of facts that plausibly meet the standard. Likewise — Right, so the Fair Labor Standards Act talks about an alleged violation, and we said that that requires the plaintiffs to plausibly allege the elements of a violation. Correct. So sometimes we read the word alleged to mean plausibly. Correct. But can I just ask a question about the implications of this argument? So the order here, that's the basis of this appeal, denied a motion to dismiss and also denied the motion to compel arbitration. Correct. So you're not saying we should reverse the motion to dismiss. Like, you're just saying this argument you're making is about why arbitration should be compelled. Is that right? I think that's correct, Your Honor. I don't believe — I think that this is a rather novel issue at this point with the EFAA and its appealability. But technically, you are not permitted to appeal. Okay, and this plausibility question, does it go to both? So I guess there's two issues. There's one as to whether the complaint plausibly alleges sexual harassment at all, and then there's whether the complaint plausibly alleges that there was a continuing violation that culminated after the effective date of the EFAA. That's correct, Your Honor. So if we think that the statute doesn't require plausible allegations, then it would also be enough to just kind of allege, even implausibly, that this is a continuing violation. Is that right? So the plausibility argument, you know, would apply to both of those? I don't think that that necessarily follows. I think that the case law on the continuing violation, which is not exactly what the standard is under Oliveri, would still require plausibility in order to establish that continuing relationship. Because the statute says, you know, you get out of arbitration if you allege sexual harassment or whatever, and that just goes to whether you're talking about a sexual harassment dispute. But when we think about whether it's timely or covered by the Act because, you know, it approves after the effective date, there's nothing in the statute that tells us that about it. So let me go to our normal standards, which would be plausibility, you're saying. Yes, for example, and especially as to the pre-EFAA conduct, I think the plausibility standard would be there to say, are the allegations of conduct from 2012 plausibly related to a termination after 2022? So then there's two arguments. One is you think that the complaint doesn't plausibly allege sexual harassment at all, even if we're not thinking about the time. And then the second one is that the comments from 2012 and 2017 and so on is not plausibly a continuing violation related to the eventual termination in 2022? Yes, and more specifically, it's not, the termination of 2022 is not plausibly pled to be a retaliation for sexual harassment, for reporting sexual harassment. Right, so you have a timely claim either if it's part of a continuing violation of harassment or if it is itself retaliation, and you agree with that? Correct. Could you, before you run out of time, turn to the issue of whether the complaint pleads sexual harassment, whether there have to be allegations of a romantic or erotic, I think the green brief uses the word erotic nature. Yes, Your Honor. I think there are two points about that. One is the cases that have decided or found sexual harassment exclusively do include conduct that is sexual in nature. And even if it also includes conduct that is just gender-based and not necessarily sexual, they still have those kinds of facts in them. They also, importantly, all include facts that are harassment. The allegations here primarily are generic denial of compensation or work because of gender. That's just, that's different than harassment. Sexual harassment is either going to be something that's sexual in nature or the kind of oppressive facts that you would find in this Court's cases. Well, when you say sexual in nature, it's not enough that the allegations are that someone is treated differently because of gender. There must be a romantic or sexual aspect to it. My argument, and it's supported in many of the cases, is that there's a difference between sexual harassment and gender discrimination, and that if you're going to be harassment, there must be something that is sexual in nature, and there must be some sort of harassment. There are some cases that will, that permit the notion that you could have a sexual harassment case where there's harassment that's based on gender. That's sex harassment. But in all those cases, the conduct is far, far worse than this. But you're not saying that it, that you can't have a sexual harassment claim. You're saying, I get your point, you're saying, not in this case, but you're not saying that you can't have a sexual harassment claim that's based on gender discrimination. I think that's correct, Your Honor. I think that cases allow for that possibility in some situations. I haven't really seen one where that's been affirmed, but I do think that the cases suggest in their dicta that you could have such a claim. Well, let's, I mean, so, right, so the EFAA says conduct constituting a sexual harassment dispute or a sexual assault dispute, right? So Congress did not say any sex discrimination dispute. So, so if it is just a matter of an employer says we don't, or decides not to hire somebody because of sex, that's just discrimination, but it doesn't involve harassment or assault, right? So that would not be covered by the statute. The classic sexual harassment case would be, you know, there's an employee and the employer is constantly making misogynistic comments, or women don't belong in the workplace, or, you know, showing, you know, there's like lewd material, whatever. Something that sort of creates an environment that changes, that's severe, pervasive, objectively offensive, and changes the conditions of employment, right? Correct, Your Honor. So, and so your argument here is that this case involves more of the first category, so I guess on the one hand there's the allegation that the employer steered work to other people out of a bias, which would look more like discrimination that's not harassment, but then there's also allegations about misogynistic comments, a frat boy environment, and so on, which looks more like harassment. So what, so why do you, so what's exactly your argument that this is the discrimination that's not the harassment? I think that if you, my argument, and it's laid out in our brief, is that the actual facts alleged, in terms of what happened, are not what would be recognized as harassment, or sex harassment. The, you know, there's one comment in 2012, which in and of itself is a problem. There's an allegation that she was asked to go shopping. Okay, but that just goes back to your, the question about whether it needs to be plausibly alleged, right? Yes. So if I allege a bunch of comments that if there were a lot more of them it would amount to harassment, and you say, well, it doesn't constitute harassment because it's not harassment if it's one-off comment. We have case law that says that, you know. It's also not sexual. There's a question about whether they've made plausible allegations, but if you don't think it needs to meet the plausibility standard, then there would be a dispute as to whether those comments rose to the level of harassment, right? Correct. I think that, yes, the plausibility standard is what says that what she has planned in this complaint is not enough. Right. I mean, I suppose that in this case the allegation is that the harm is not from the hostile environment. The harm is from losing out on work and then eventually being terminated. So maybe that makes it not exactly a harassment case. That makes it exactly not a harassment case. It makes it exactly a claim of gender discrimination, which is different than a claim of sexual harassment. Okay. Thank you, Mr. Feer. You reserved time for rebuttal, so we'll hear from you again. But let's turn to the appellee, Ms. Leighton. Good morning, and may it please the Court, Shelby Leighton for appellee Rebecca Rosano. This Court can affirm if it finds even one sexual harassment claim or retaliation claim under any of the statutes is a sexual harassment dispute under the EFAA and accrued after its effective date. So in addition to the sexual harassment claim that you've just been talking about, there are also the retaliation claim, which is based on her termination, which occurred... Can we talk about each one of those? Right. So then there's this question about whether it's a plausible allegation of sexual harassment in the first place and then whether it's a continuing violation that continues after the effective date. Right. So the allegation is that he made these comments in the frat boy environment, right? There's numerous allegations. But the harm to her is being denied work. Is that right? Is work being steered to others? No. I think the harm to her is a hostile work environment. And that hostile work environment is made up of a number of both sexual and non-sexual actions that are taken because of her sex. So what are those actions? I mean, there's the comment he says about pro bono, right, in 2012. That's right. So he made that comment. There's an allegation that he would kiss female lawyers. Hello. That he would tell, quote, off-color stories. But it's harassment at her. Doesn't it have to be something in her presence that alters the terms of her employment? Right. That happened in her presence. Which is, like, pervasive. Like, he did it all the time. And he did it in front of his employee. That's right. The allegation is that he did it in front of her. That he told stories to her about his, quote, weekend escapades and that he failed to take action when a client of his sexually harassed his assistant by asking her to sit in his lap. And she knew about that happening as well. And this court has held that sexual harassment that happens to other people can be part of the household work environment. And then there was also a campaign of other sex-based differential treatment, including denying her billable work, directing work to male attorneys instead of her. But I don't know that I saw a lot of facts about, like, well, she could have been on this, but she was taken off of it because of a bias and so on. I mean, do we have some underlying facts about what work she was denied and how that — I mean, there's some comment about a slow period during one period of her employment, but that implies that it wasn't generally slow. So I don't — so what are the facts that show that there's a denial of work? Well, I think the most egregious fact is that he never once — there was not a single occasion, is what the complaint says, where he steered incoming New York work in her direction. And so the reason why there aren't specific instances is because there was — it was happening the whole time. He never once sent her a case, even though that was his job. So he's — this guy is the vice chair of litigation in New York, right? That's right. And in 2020, she moves to Florida but still works for the firm, right? But do you — Yes. Is it meaningful that there's, like, one partner in the New York office from which she's not getting — like, how do we know that that is something that — She was — — that shows that she's being — like, you know, I worked at a law firm. It's not like — there were plenty of partners I never talked to. So, I mean, so how do we know that that is an actual discrimination as opposed to just the normal operation of the place? Well, the complaint alleges that he was in that role assigning work to her and — or denying work to her until 2022 when she left the firm. And my understanding — and I'm not sure if this is in the complaint — is that she was working remotely from Florida, but she was working for the New York office. Her position hadn't changed. So this guy was in charge of — So he was — — writing assignments for everybody in the New York office? That's right. The allegation in the complaint is that as the vice chair of business litigation, he was, quote, supposed to evaluate the incoming work for distribution to available attorneys that suited for the legal needs of the matter. But instead of doing that — But now you're saying that he was in charge of all work assignments, and also he never assigned her any work. But she was there for a long amount of time and was elevated to income partner, right? So she did some work. Well, she — he was responsible for taking incoming requests for work and assigning them to people. But there's other ways that people get work. So she would — A failure to assign work to her, is that sexual harassment? How does it fit into that? I think when taken as part of a larger hostile work environment. So it's not just the failure to assign work. It's the comments I discussed earlier. It's the fact that the complaint alleges that she was singled out for scrutiny about her whereabouts, that male employees were not subject to scrutiny, that he badmouthed her to other attorneys throughout the firm. To be a hostile work environment for these purposes, does it have to be of a sexual nature? Does it have to be conduct of a sexual nature? No, it doesn't. In other words, you can still have hostile work environment as sexual harassment even if there isn't a sexual element to it? That's right. The phrase — And what's the basis for saying that? Yeah, so under all the — well, just to back up. The EFAA defines sexual harassment as — or it says, conduct alleged to constitute sexual harassment under applicable federal, tribal, or state law. And so it's directing the court to look at what is sexual harassment under federal and state law claims at issue in this case, which are the New York City Human Rights Law, the New York State Human Rights Law, and Title VII. In all of those statutes, sexual harassment has a defined meaning that is broader than just lewd conduct. It's referred to a subset of sex discrimination claims where there's conduct in the workplace that has the effect of altering terms and conditions of a worker's employment because of her sex, even if there's no tangible employment action. So I agree with that. Right, so you can have something that we would call sexual harassment even if it doesn't involve lewd conduct. So let's say an employer is just continually making comments like, women don't belong in the workplace, and like, I don't think women belong here or whatever. And it's not lewd, but it creates a hostile environment that we would consider harassing. So that's right. But I guess what I'm struggling with is the link between the different adverse actions that are taken against her, right? So this goes to the continuing violation question. So normally when we think about a continuing violation, it's the kind of violation that by its nature accrues, right? So it might be that the employer makes one misogynistic comment. It's not a hostile environment at that point. He makes two. Maybe it's getting closer. At some point he makes like ten. It becomes more pervasive. And so like the idea of it is that it accrues over time, right? It's the nature of the thing. Denying somebody work because of a sex-based bias just seems like a different claim, right? It seems like a different violation that you're taking an adverse employment action based on a sex-based bias. It's not that that is part of the environment, right? And the termination is still another thing, right? Like if it's a sex-based termination, that would be an act of discrimination that's not part of the hostile environment but is separate. If you had a complaint, you would file three claims, hostile environment, denial of work, and wrongful termination. So why should we read it all as a continuing violation as opposed to three violations? So I would point you to this court's King v. Aramark Services case where the court held that a discrete discriminatory act such as termination may render a hostile work environment claim timely if it's shown to be part of the course of discriminatory conduct. Well, right. So that's the interesting thing about King, right? It says that the separate discrete act can be evidence of a hostile environment and render such a claim timely but only if it's shown to be part of the course of discriminatory conduct that underlines the hostile work environment claim. So the thing about that is somebody was engaging in harassing conduct as part of the harassing conduct like subverted an HR investigation or whatever that led to the termination. And it's just that sort of the fact pattern there was that there just was overlap in the evidence of the hostile environment and the termination, right? So it wasn't the termination itself that was part of the continuing violation. It was the sort of harassment that affected HR's view of the employee, right, at the same time as the termination. I think that's essentially the same as in this case. So in this case, what was happening is that DePalma was engaged in a campaign of harassment. There was both sort of this boys club, you know, inappropriate comments, but also what you would characterize as hostility to women in the workplace, the idea that women shouldn't be assigned work, that, you know, women shouldn't be trusted, and a particular campaign to disparage Ms. Porzano to partners both in the New York office and beyond, including partners on the equity committee that ultimately fired her. And in addition, there's the denial of billable hours, which is also what led to her termination. So the idea would be that the dispute over the pro bono certification that kind of prompted the termination, that you think prompted the termination, that actually that wasn't sort of the bona fide reason, that actually the guy was looking for an opportunity to fire her? Well, the stated reason for her termination was lack of billable hours. There's two things, right? So, like, DePalma gets angry because she doesn't certify the pro bono thing, and then the managing partner comes along and says your billable hours are too low. But I think that— So what's exactly the connection between the billable hours thing and the—oh, I see. You're saying that because she only had low billable hours because she was denied access to assignments? So he—the allegations are that he engaged in a hostile work environment that included denying her billable work throughout the entire time that she was at the firm, from the time he became vice chair until the day she was terminated. And that denial of billable work contributed to her having a low number of billable hours, is the allegation in the complaint, and that is the stated reason why she was terminated. And so I think that's an even closer connection. You're actually not really saying that the harassment is, like— that the termination is part of the conduct. It's the denial of the billable hours that might have led to the termination, but it's the denial of the billable hours that's the thing that you think is what you should recover for on your harassment. The acts that DePalma engaged in to lead to her termination are part of the hostile work environment that he subjected her to throughout the entire time that she was at the firm. And I think that's similar to the King case, where the allegations were that she was excluded from meetings, which is also an allegation in this case, that he gave her unrealistic deadlines and expectations, denied her appropriate office space, spoke to her in a rude manner. If we need to conclude that DePalma's denial of work to her is what was responsible for low billable hours and therefore the termination, wouldn't we need some allegations about how much work he gave to other people or how much she should have been expected to get absent the discrimination? Well, the allegations are that he gave the work that came in to the firm to male attorneys. Fair enough. Is that conclusory? I just don't know what the baseline would be that she should expect. She obviously did some work for the firm. She was there for a long time and she was promoted. So how do I know that DePalma's assignment power was used in a discriminatory fashion that led to her termination? Well, I don't think that you have to. We're not, you know, it's not being argued for the EFAA purposes that her termination was caused by the billable hours alone. And I think what did happen is that DePalma was engaged in a campaign to try to get her fired. One way he did that was by denying her billable hours. He opposed her promotion. He disparaged her repeatedly to partners throughout the firm. And, you know, generally tried to turn people against her. And so I think it's not just that she was fired ultimately for the billable hours. Was she doing this even after she moved to Florida? The allegation is that the denial of work continued until 2022, and that him disparaging her to people on the committee that were making the firing determination is what led to her termination. So that would have happened around the time of the firing. So it's like, so the managing partner, it's like kind of, is it a cat's paw idea? Like the managing partner is basically, you know, implementing his discriminatory design? Well, it's all just part of a hostile work environment by DePalma. So for the sexual, for the retaliation claim, which we can talk about, I do think it is more, it's a cat's paw theory. It's basically the termination. That's, oh, yeah, right. I'm happy if you're considering the termination. The termination is a discreet act. And, you know, I mean, he's so powerful that like she's living in Florida, but she still is exposed to a hostile work environment. Well, she was fired. I mean, I think that's pretty powerful. So I think that the hostile work environment that continued during COVID when people were remote was essentially this denial of work and talking to people, disparaging her, treating her differently. You said that you think it's a harassment claim under Title VII and II, so maybe not a lot of turns on this. But what about the case law from New York that says that the state and city law don't apply extraterritorially, that the impact has to be felt in New York? So if, in fact, she was living in Florida from 2020 until she was terminated, do the state and city laws apply to those claims? They do. And this is a question, yeah, that goes to the merits of her New York City claim. But the impact has to be felt in New York. But courts have held that that's satisfied if even one incident of harassment happened in New York City. And here we have a decade of harassment that occurred in New York City. But that's all before 2020, right? But that's what I mean by this is about the merits of her—the plausibility of her New York City human rights law claim, not about the timing of the EFAA. The timing of the EFAA is— No, no, no, but I actually am asking about the timing of the EFAA. So if I think that a claim has to accrue after the effective date of the EFAA, and she moved to Florida before the effective date, the theory of the continuing violation doctrine is that the claim keeps reaccruing as the conduct continues. That's right. The thought is if she's now moved from New York to Florida, the claim keeps reaccruing in Florida under whatever law applies there as opposed to the New York law, which only applies if the impact is felt in New York. Well, so if you take the EFAA piece out of it for a second, you're looking at just a New York City human rights law claim. You could allege a New York City human rights law claim based on this conduct, some of which happened in Florida and some of which happened in New York. And say the statute of—you know, you're trying to meet the statute of limitations. You would be able to rely on the fact that a bunch of the conduct happened in New York before the statute of limitations, and— Oh, is that right? So there are cases where the New York courts say that? So let's say there is conduct that happened before the statute of limitations in New York, and then the person moves to another state and continues with the same employer. You're saying a New York State court would say you could recover for the otherwise time-barred conduct because they continue to do something to you in another state? Well, it's like you're looking at the continuing violation. Like, so the—what I mean is that the continuing violation question is a separate question than the question of extraterritorial application. So for the continuing violation, you look at what is the last—when did the last act of discrimination happen? For the extraterritorial, you look at the whole course of discrimination and whether any of that conduct happened in New York City. And so once you make that determination that some of the conduct happened in New York City, you then look at—for the continuing violation, you look at the whole course of conduct and whether one piece of that conduct happened after the statute of limitations or after the EFAA. So, for example, in the—there's the Desidero case—I think I'm probably saying that wrong— where the Southern District of New York held that in a similar situation, there was someone who moved to Florida during COVID and was terminated when she lived in Florida, and that was the sort of hook for her New York City human rights law claim. But before that, she had been harassed at a single meeting that happened in New York City. And the court said the fact that she attended that single meeting in New York City was enough to bring it within the scope. It's Desiderio. It's cited in our brief. And so, yeah, that would be an example of where the impact is felt simply because one incident happened in New York City. And that's certainly the case here. But I think even if the New York City human rights law doesn't apply, we do argue, as you point out, that this meets the standard under Title VII and the New York State human rights law, which defendants have not argued that this is not within the scope of the New York State human rights law. But the same principle applies, right? The state courts say the same thing about extraterritoriality for the state and the city. They do, but defendants have just simply never argued that this is not an extraterritorial application. And but, again, if I – well past my time. So it can – this Court can affirm on if even one of the claims is a sexual harassment dispute within the scope of the EFAA, and we would ask you to affirm on that basis. Thank you. Thank you very much, Ms. Blayden. We'll turn back to Mr. Feer on rebuttal. Thank you. Two brief points. The Desiderio case, I think, also points out that the conduct in the city must be within the statutory period, and here that it was not within the statutory period. So we don't – Right. So your argument would be that you can have a human violation, but that means it keeps reaccruing. And if it reaccrues in another place, it would be covered by the statute of limitations.  Under the New York law.  And also, with regard to the King case and the continuing violation, I would like to point the Court to the language of the King case that says, an unrelated discrete act different in kind from the conduct giving rise to the hostile environment does not trigger the continuing violation doctrine. Here, there are numerous reasons why the chain is broken between alleged conduct prior to the effective date and the termination after the effective date. Number one, the conduct is 10 years earlier. There's nothing alleged as to her later than 2012. There's nothing alleged as to anybody later than 2017. Well, I mean, maybe you'll say it's too conclusory, but they do say that he's continually denying her work and is badmouthing her to other people and so on. You say there are no facts that show that. There are no facts. Correct. Number two, she says that she complained about these lewd comments, et cetera, but she was not terminated. In fact, although Mr. DePalma opposed her promotion to partner, she was actually made partner by the same executive committee that she says improperly terminated her. The complaint is clear that her termination was not done by Mr. DePalma. It was done by people in a different department, the eight-member executive committee, of which she was not a member. As the Court has noted, she moved to Florida for over a year and had no contact with the office. And in addition, as you've also noted, the complaint is very specific in its allegation that the termination was prompted by this pro bono investigation, which is not sexual harassment. Her termination, to the extent that it occurred after the EFA, is not a sexual harassment claim because it is not plausibly a result of her complaining about her sexual harassment as was required under Olivari. I mean, if there were, I take it you're going to say that these allegations aren't in the complaint. But in principle, if you could say, well, look, other similarly situated male employees also had the same number of billable hours or whatever and were not fired, and so therefore you could make a plausible inference that she was only fired because of discriminatory animus, then that would make it more plausible, right? It might make it a plausible gender discrimination claim, not a sexual harassment claim. So what about this idea about denying the work? So again, you said a moment ago you don't think that the facts support this. But, like, let's say there were enough facts to establish that DePalma was, because of a biased reason, denying her the same amount of work as everybody else, and then she gets fired for not having enough work, which results from that discriminatory course of conduct. That would look more like a—what would that be? It might look more like, but it still doesn't meet the standard of Olivari, which is it has to be retaliation for being reported. All right, so this wouldn't be retaliation, but maybe that itself would be a course of conduct that culminates in the termination. I guess you might say it's still not harassment because it's denying the work. That's correct. So you have to show a connection between the denial of the work and the harassing. It's, as you said in King, it's conduct of a different kind. Can I ask if I know about Mr. DePalma's authority about assigning work to members of the firm out of the New York office? So the allegation that he is in charge of assignments or whatever, is that enough for me to know that she could be denied the same amount of work that everybody else would get? No. And how do I know that? I mean, the fact is that in that job, to the extent he has any role with distributing work, it's to associates. Ms. Brizano was a partner from 2012 on, and that is not his role. What does that mean? She has her own clients that she cultivates or something like that? That's what the role of a partner is. And to the extent that the court wants any illumination on it, it's actually in the complaint. The attachment to the complaint is the defendant's position statement, which lays out all the details about those roles. Okay. Thank you very much, Mr. Peter. The case is submitted.